# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

TIMOTHY WANDLING, )
         )
  **Plaintiff,** )
         )
 v. )  **Case number 4:04cv0952 TCM**
         )
JO ANNE B. BARNHART, )
Commissioner of Social Security, )
         )
  **Defendant.** )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Thomas Wandling's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Mr. Wandling ("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied in July 2001 for DIB and SSI, alleging a disability since June 2001 caused by arthritis in his back, pancreatitis, and right knee problems.  (R. at 48-50, 369-71.)[2] His applications were denied.  (Id. at 30, 39-43, 373-78.)  Subsequently, a hearing was held,

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

at Plaintiff's request, in April 2003 before Administrative Law Judge ("ALJ") Michael J. Haubner. (<u>Id.</u> at 381-416.) The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied his applications. (<u>Id.</u> at 18-23.) The Appeals Council denied Plaintiff's request for review of that decision, effectively adopting the ALJ's decision as the final decision of the Commissioner. (<u>Id.</u> at 6-9.)

## Testimony Before the ALJ

Plaintiff and Gary Weimholt testified at the administrative hearing.

Plaintiff testified he was born on August 31, 1953, and was then 49 years old. (<u>Id.</u> at 386.) He had completed the twelfth grade. (<u>Id.</u> at 387.) He lives with his girlfriend in a one-story house. (<u>Id.</u> at 399.)

Plaintiff worked construction jobs operating heavy equipment from the 1980's until May 2001. (<u>Id.</u> at 387, 389, 390.) He was diagnosed then with pancreatitis. (<u>Id.</u> at 387.) He had tried to return to work, but was unable to. (<u>Id.</u>) And, when he was working during the past few years, he would miss three or four days of work each week. (<u>Id.</u> at 394.) He did not get fired because his employers liked him. (<u>Id.</u>)

Plaintiff further testified that he had stomach pains every day, although some days were worse than others. (<u>Id.</u> at 390.) By the time he quit work, he was having disabling stomach pains three to four days a week. (<u>Id.</u> at 394.) If he was still working, he would still be having the disabling stomach pains. (<u>Id.</u> at 395.) Indeed, he feels the same whether or not he is working. (<u>Id.</u> at 396.) His physicians have told him the pain is caused by his pancreatitis. (<u>Id.</u>) He described the pain as "heavy moderate." (<u>Id.</u> at 398.) To help relieve

the pain he lies down for approximately one hour.  (Id.)  Plaintiff takes Librium for his stomach pains.  (Id. at 395.)  The frequency of his doctor visits varies from once a month to twice a month.  (Id.)

When asked why he was using a cane, Plaintiff explained that he had four knee surgeries on his right knee – the last one being in 1989 – and a bad back.  (Id. at 391.)  He had been using the cane every day for three years.  (Id. at 392-93.)  When he was working, he used the cane to climb the one step onto his equipment.  (Id. at 392.)  Additionally, his knee became swollen if he had to sit too long in one position.  (Id. at 393.)

Plaintiff stopped drinking more than one year before, probably in August 2002.  (Id. at 396.)  Before then, he was drinking two or three beers a night.  (Id.)  Before that, he was drinking six to eight beers a night.  (Id. at 397.)  When he stopped working in May 2001, he was probably drinking three of four beers a night.  (Id.)  He stopped drinking after the doctor told him he would die if he did not.  (Id.)

Plaintiff's daily activities are primarily sitting and watching television.  (Id. at 399.)  He tried to vacuum five months before, but could not.  (Id.)  His girlfriend does the rest of the work.  (Id.)  He has not driven for a year.  (Id. at 400.)  His sister drives him places and carries the groceries for him.  (Id.)  The heaviest weight he can lift is 10 to 20 pounds.  (Id. at 401.)  The longest he can stand is 15 to 20 minutes, and that would be with a cane.  (Id.)

Gary Weimholt testified as a vocational expert ("VE").[3]  He opined that a person who could lift and carry 20 pounds occasionally and 10 pounds frequently; could occasionally

---

[3]Plaintiff did not object to Weimholt's qualifications as a VE.

balance, stoop, crouch, and climb ramps and stairs; could never use ladders, ropes, or scaffolds; could never kneel or crouch[4]; and should avoid all hazards such as machinery and heights could not perform the work Plaintiff formerly did either as he described it or as it is described in the Dictionary of Occupational Titles ("DOT"). (<u>Id.</u> at 406.)  There was some work that this hypothetical person could perform using transferable skills: pick-up truck delivery drivers; couriers; and van drivers. (<u>Id.</u>)  There were approximately 2,500 such jobs in the regional economy. (<u>Id.</u>)  There were also approximately 5,000 jobs in the regional economy that were small part or product assemblers and that could be performed by the hypothetical person. (<u>Id.</u> at 408.)  Simple cashiering jobs existed in the same number and could be performed by the hypothetical person. (<u>Id.</u>)

If the hypothetical person also had a 65% disability in one of his knees, as Plaintiff did according to his treating physician, the person would not be able to do light work. (<u>Id.</u> at 409.)  The person would be restricted to sedentary work, meaning that there were no transferable skills from Plaintiff's skill base. (<u>Id.</u> at 409-10.)  The person would, however, be able to work as a very small part assembler, e.g., plastic parts. (<u>Id.</u> at 410.)  There were approximately 1,500 of these jobs in the regional economy and 4,500 in the state. (<u>Id.</u>)  The person could also work at some hand packaging jobs. (<u>Id.</u>)  The type and number of these jobs would not change if this person needed to use a cane to walk. (<u>Id.</u> at 411.)  If the hypothetical person additionally needed a minimum of an hour to recover from daily

---

[4]The ALJ inexplicably included in his hypothetical question an ability to occasionally crouch and a restriction against any crouching.  This inconsistency is not relevant.

abdominal pain that occurred without warning there were no jobs that this person could perform.  (Id. at 412-13.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

As part of the application process, Plaintiff completed a disability report, a work history report, a pain questionnaire, and a claimant questionnaire.  In the disability report, Plaintiff listed chronic pancreatitis, rheumatoid arthritis in his back, and a 65% disability in his right knee as his disabling impairments.  (Id. at 62.)  He explained that he could not work an eight-hour day because his stomach pain was very severe and he was weak.  (Id.)  He could not do physical labor because of the pain in his back and right knee.  (Id.)  He stopped working on June 18, 2001.  (Id.)  He had seen Dr. Bart Kairuz in June 2001 for his stomach pain and had been referred to Dr. G. Naidu.  (Id. at 64.)  He had also been hospitalized twice that month for the pain.  (Id. at 65-66.)  Plaintiff listed three jobs in his work history report.  (Id. at 75.)  One, from 1978 to 1989, was doing excavation and the last two were working construction.  (Id.)  Each involved the operation of heavy equipment.  (Id. at 76-78.)

In the pain questionnaire, Plaintiff reported that his stomach pain prevented him from squatting, reaching, sitting, or stooping.  (Id. at 83.)  In the claimant questionnaire, Plaintiff reported that he had to change positions frequently to relieve his stomach, back, and knee pain.  (Id. at 84.)  The stomach pain restricted his activities the most.  (Id.)  This pain limited

his daily activities to a great degree; the back and knee pain was worse on some days than others and the degree depended on his activity.  (Id.)  Other than restricting his diet and taking his medication, Plaintiff could only rest to relieve the stomach pain.  (Id.)  The medication made him nauseous and restless.  (Id. at 84-85.)  His meals were prepared for him; he did not assist his housemate with any chores.  (Id. at 85.)  He was too tired and in too much pain to enjoy his former hobbies of car racing, traveling, and fishing.  (Id. at 86.)  He watched television, but had problems staying awake and sitting long enough to watch a program.  (Id.)  He read the newspaper.  (Id.)  He had a driver's license, but did not drive for fear he would pass out if he had a pain attack.  (Id.)  He could sit for 30 minutes, stand for 15, and walk for 10 before the pain limited his ability to do so.  (Id. at 88.)  He could not bend, kneel, or squat, and had difficulty reaching.  (Id.)

Plaintiff's medical records begin with a May 1989 letter to an attorney from Richard C. Lehman, M.D., opining that Plaintiff had a 65% disability of the right knee secondary to degenerative arthritis.  (Id. at 95.)  He did not have full extension or full flexion in that knee. (Id.)

The next medical records are dated November 1994 when Plaintiff consulted Bartolome Kairuz, M.D., about an earache.  (Id. at 115.)  In May 1996, he consulted him about a possible urinary tract infection and pain in his lower back.  (Id.)  He was prescribed Darvocet.  (Id. at 114.)  An x-ray revealed moderately extensive degenerative changes in his lumbar spine.  (Id. at 112.)  Plaintiff consulted Dr. Kairuz in February 1999 for pain in his right arm.  (Id. at 114.)  He next consulted him in June 2001 for abdominal pain.  (Id. at 111.)

Dr. Kairuz noted that Plaintiff had been diagnosed with rheumatoid arthritis. (Id.) Plaintiff was then smoking three cigarettes to a pack each day and drinking two to three beers each night before dinner. (Id.)

Shortly after Plaintiff's February 1999 visit to Dr. Kairuz, he went to an emergency room with complaints of pain at the base of his neck radiating to his right shoulder and arm. (Id. at 108.) He had no chest pain. (Id.) Six week later, he went to a clinic at the St. Louis County Department of Health for a physical examination. (Id. at 102-06.) He complained of pain in his right shoulder and upper arm for the past two months, and reported that he had been told in the emergency room that he had mild hypertension and bronchitis. (Id. at 102, 106.) He also reported chronic pain in his right knee, injured after a fall in 1988. (Id. at 102.) The next month, in April 1999, he returned for a follow-up appointment, reporting that the shoulder and arm pain were resolving and that he was feeling better and had no further complaints. (Id. at 96.) A chest x-ray was normal. (Id. at 98.) Blood work indicated a rheumatoid factor of 41; a range of 40 to 79 is "weakly reactive." (Id. at 100.) His blood pressure and hypertension were controlled; his cervical lordosis loss was improved. (Id. at 96.) He was to return in three months. (Id.) There is no record of him doing so.

On June 5, 2001, Plaintiff went to St. Anthony's Medical Center ("St. Anthony's") with complaints of abdominal pain. (Id. at 299-300.) The pain was described as a four on a scale of one to ten, with ten being the most severe. (Id. at 302.) He reported that he had had the pain for the past 12 days. (Id. at 302, 304.) He was nauseous, but was not vomiting. (Id. at 304.) A computerized tomography ("CT") scan of his abdomen and pelvis was normal

with the exception of some vascular calcification in the abdominal aorta.  (Id. at 310-12.)  A chest x-ray revealed some gas and stool in the colon and some degenerative changes in his lumbar spine but was otherwise normal.  (Id. at 313.)  The consulting physician noted that Plaintiff had had no recent weight loss, had had no similar abdominal pains in the past, and had had a good appetite.  (Id. at 317.)  Diverticulitis and peptic ulcer disease were to be ruled out.  (Id.)  Plaintiff did have mild hypertension and a history of rheumatoid arthritis of the back.  (Id. at 318.)  A colonoscopy was scheduled for the next morning.  (Id.)  The next day, he had the colonoscopy, a gastroscopy, and an x-ray of his lumbar spine.  (Id. at 243, 323, 334.)  Although the first two tests revealed a large hiatus hernia, neither revealed the cause of his abdominal pain.  (Id. at 334-35.)  The x-ray revealed an osteoarthritic change of his lumbar spine with muscle spasm and degenerative discs with narrowing of the disc spaces at L4-L5 and L5-S1.  (Id. at 243.)  He was discharged that day with instructions to continue on Pepcid and with a diagnosis of abdominal pain, epigastric; diaphragmatic hernia; and unspecified gastritis.  (Id. at 314.)  He was also to follow-up with Dr. Kairuz as needed.  (Id. at 354.)

Plaintiff went to the emergency room of the Missouri Baptist Medical Center on June 7, complaining of persistent abdominal pain for two weeks.  (Id. at 125, 138-43.)  He had no complaints of epigastric, shoulder, or back discomfort.  (Id. at 125.)  He had not been on any medication.  (Id.)  He was admitted to the hospital the next day.  An x-ray of his abdomen was taken on June 9 and revealed only moderate intestinal gas primarily in his colon.  (Id. at 118.)  There was no significant distention, no bowel obstruction, and no perforation.  (Id.)

A sonogram of his upper abdomen revealed a normal gallbladder.  (Id. at 122, 136.)  The pancreas was obscured by bowel gas and could not be assessed.  (Id.)  An imaging of his gallbladder ejection function showed a diminished ejection function.  (Id. at 123.)  This was considered to be of "uncertain significance in view of the absence of suggestion of biliary tract pathology and [his] improvement" after hydration.  (Id. at 127.)  He was released from the hospital that same day with no restrictions and no medications and with instructions to follow up with Dr. Kairuz.  (Id. at 128.)

On June 16, Plaintiff returned to the emergency room at St. Anthony's with complaints of generalized abdominal pain.  (Id. at 272.)  It was the third time he had the pain in the last month and one-half.  (Id. at 274.)  The first time he was seen in the emergency room and was sent home with medications.  (Id.)  The next time, he went to the emergency room at Missouri Baptist Hospital.  (Id.)  He smoked one and one-half packs of cigarettes a day and drank "fairly heavy, beer in the evening."  (Id.)  He was not taking any medication and had had no prior abdominal problems until recently.  (Id. at 275.)  He had no problems with his legs.  (Id.)  On admission, he had moderately severe pain and was given a morphine drip.  (Id. at 274.)  His pain completely subsided the following morning.  (Id.)  He was given a choice of being transferred to a skilled nursing facility for intravenous fluids and medication or being sent home with the possibility of being readmitted if the problem was not managed.  (Id. at 276.)  He chose the latter.  (Id.)  He was sent home with medications, Levaquin and Prilosec, and instructions to stop drinking and smoking and start a low-fat diet.  (Id. at 274, 297.)  The diagnosis was chronic pancreatitis and alcoholism.  (Id. at 276.)

Five days later, on June 23, Plaintiff went to the emergency department at St. Anthony's with complaints of abdominal pain for the past three weeks and "coffee ground" emesis, or vomiting.  (Id. at 207-08.)  His pain that day was ten on a scale of one to ten, with ten being the most severe.  (Id. at 208.)  He also had back pain.  (Id.)  He was admitted the next day with a diagnosis of acute recurrent pancreatitis with gastritis and essential hypertension.  (Id. at 195, 221.)  His blood pressure was elevated and he was in a lot of pain. (Id. at 195.)  A CT scan of his abdomen revealed an edematous pancreas consistent with pancreatitis but was otherwise negative.  (Id. at 197-98.)  There were no pseudocysts.  (Id. at 197.)  An endoscopic examination of the common bile duct was negative.  (Id. at 199, 244.)  The next day, Plaintiff was reportedly doing better and had much less pain.  (Id. at 194.)  He was more comfortable, and his blood pressure was better.  (Id.)  The progress notes of June 26 describe Plaintiff as being a severe nutritional risk.  (Id. at 186.)  A low fat diet was discussed with him.  (Id.)  Later that day, the notes again indicate that Plaintiff was doing much better and his pain was much less.  (Id. at 185.)  He was to start on clear liquids. (Id.)  The next day he was reportedly tolerating the clear liquids and had no fever.  (Id.)  The progress notes of June 28 indicate that Plaintiff was doing very well.  (Id. at 184.)  He felt nauseated but was not vomiting.  (Id.)  He was discharged that day with instructions to follow up with the nutrition department as needed.  (Id. at 216.)

On his own initiative, Plaintiff underwent a total body MRI and CT scan on July 11. (Id. at 144.)  This screening revealed an enlarged pancreas, consistent with pancreatitis,

calcification in the arteries, small nasal cysts, and degenerative intervertebral discs at C5-6, L3-4, L4-5, L5-S1, and in the lower dorsal spine.  (Id. at 144-46.)

On November 30, Plaintiff had another CT scan of his abdomen.  (Id. at 162, 367.) Decreased thickening of his pancreas with a residual peripancreatic inflammatory was revealed.  (Id. at 162-63.)  A possible two centimeter pseudocyst was indicated, and further evaluation was suggested.  (Id. at 163.)

In March 2002, a CT scan of his abdomen revealed a pancreas within normal limits. (Id. at 365.)  It was no longer enlarged.  (Id.)  Plaintiff had gained seven pounds since November 2001.  (Id. at 361.)  Nine months later, in December, Plaintiff had pain in his left lower abdomen.  (Id. at 362.)  His appetite was fair, although he had lost two pounds since March.  (Id.)  It was noted that he had a history of pancreatitis.  (Id.)

Plaintiff's next, and last, medical record is the report of a colonoscopy performed in January 2003.  (Id. at 360.)  Plaintiff then had had left lower quadrant abdominal pain for three weeks.  (Id.)  He was nauseous.  (Id.)  He had been treated with antibiotics on the assumption he had diverticulitis, but had not improved, hence, the colonoscopy.  (Id.)  A small colon polyp was resected.  (Id.)  Plaintiff was started on Donnatal for his abdominal pain.  (Id.)

The records before the ALJ also included the report of a consultative examination performed in September 2001 by Elbert H. Cason, M.D.  (Id. at 147-50.)  Plaintiff gave a history of smoking one-third a pack of cigarettes a day and no alcohol.  (Id. at 148.)  On examination, he could not straighten his right leg and knee joint completely.  (Id.)  When

standing, his right knee was in a slightly flexed position.  (Id.)  He also had a decreased range of motion in his lumbar area, but did not have any muscle spasms.  (Id.)  His blood pressure was excellent.  (Id.)  Plaintiff could not squat or heel to toe walk.  (Id. at 149.)  "There was no evidence of any neurological abnormality, sensory, motor or reflex abnormality, muscle atrophy or muscle spasm."  (Id.)  There was, however, muscle tenderness in his lumbar paravertebral area.  (Id.)  His lumbar spine flexion/extension was limited to 60 degrees and his lateral flexion was limited to 10 degrees in both directions.  (Id.)  The range of motion in his right knee was limited to 120 degrees out of a possible 150 degrees.  (Id.)  Plaintiff reported that he used a cane, but he did not bring one to the office.  (Id.)  Dr. Cason later opined that Plaintiff would require the use of a cane to walk on uneven terrain.  (Id. at 151.)

Two months later, in November 2001, a physician[5] assessed Plaintiff's physical residual functional capacity.  (Id. at 154-61.)  Plaintiff's exertional limitations were assessed as being able to occasionally lift 20 pounds, frequently lift 10 pounds, and stand or sit for 6 hours during an 8-hour workday.  (Id. at 155.)  He had several postural limitations; specifically, he should never kneel, crawl, or climb a ladder, rope, or scaffolds and should only occasionally balance, stoop, crouch, or climb a ramp or stairs.  (Id. at 156.)  He had no manipulative, visual, or communicative limitations.  (Id. at 157-58.)  His only environmental limitation was the need to avoid heights due to the problems with his right knee.  (Id. at 158.)

## The ALJ's Decision

---

[5]The signature of the physician is illegible.

The ALJ concluded that Plaintiff's residuals from right knee surgeries and from pancreatitis were severe impairments but his degenerative disc disease, for which Plaintiff had not sought any significant treatment, was only a slight impairment. (Id. at 18-19.) The ALJ further concluded that:

> [Plaintiff] retains the residual functional capacity to perform sedentary work with stooping, crawling, climbing ramps and stairs and balancing occasionally but no climbing ladders, kneeling or crouching; he must avoid all hazards such as machinery and heights and has an alleged 65% disability secondary to his right knee injury. Consequently, he remains capable of performing jobs existing in significant numbers in the national economy.

(Id. at 19.) In reaching these conclusions, the ALJ noted that Plaintiff's impairments could reasonably be expected to produce some of his alleged symptoms, but not to the degree alleged. (Id.) His testimony about the extent of his limitations was held not to be entirely credible. (Id.) After outlining the factors to be considered when evaluating a claimant's credibility, the ALJ noted that Plaintiff's pancreatitis appeared to be resolved as of March 2002 and that Plaintiff had had no treatment for his right knee since the 1989 surgery. (Id. at 20.) The ALJ further noted that Plaintiff had made inconsistent statements, particularly about his alcoholic consumption. (Id.) Although Plaintiff could not, according to the VE's testimony, return to his past relevant work as a construction heavy equipment operator, he could perform sedentary jobs described by the VE. (Id. at 22-23.) Consequently, Plaintiff was not disabled within the meaning of the Act. (Id. at 23.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the

duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).  The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Banks**, 258 F.3d at 824.  See also 20 C.F.R. §§ 416.920(f), 404.1520(f).  The Commissioner may meet her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert.  **Pearsall**, 274 F.3d at 1219.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  **Cox**, 160 F.3d at 1206-07.  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite

conclusion.  **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir.

1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).  Thus, if "it is possible to draw

two inconsistent positions from the evidence and one of those positions represents the

agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244

F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ's adverse decision is not supported by substantial

evidence on the record as a whole.  Specifically, the ALJ (a) failed to articulate a legally

sufficient rationale for his conclusion that Plaintiff's back pain was only a slight impairment

and to develop the record as to that back pain; (b) failed to properly assess Plaintiff's

credibility; and (c) failed to ask the VE a proper hypothetical question because of the two

previous errors.  The Commissioner disagrees.

Back Impairment.  Contrary to Plaintiff's argument, the ALJ did articulate the basis

for his conclusion that Plaintiff's back pain was no more than a slight impairment with a

minimal effect on his ability to work.  That basis included the lack of any significant medical

treatment for his back.  Indeed, the medical records reflect that Plaintiff complained of back

pain only twice, once in May 1996 and once in June 2001.  He continued to work for five

years after the first complaint.  The x-rays of his spine were done in conjunction with

attempts to find the cause for his abdominal pain and not in response to his two complaints

of back pain.  Moreover, those x-rays do not show any significant changes from 1996 to

2001.

Plaintiff further argues, however, that the ALJ failed in his duty to develop the record as to his back pain.

Plaintiff correctly notes that "it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel[.]"  **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000) (alteration added).  Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added).  This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).  This duty does not arise, however, if a crucial issue is not undeveloped. **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005); **Stormo**, 377 F.3d at 806. Additionally, although "[t]he current regulations make clear that [RFC] is a determination based upon all the record evidence," **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000), including "'the medical records, observations of treating physicians and others, and an individual's own description of his limitations,'" **Krogmeier v. Barnhart**, 294 F.3d 1019, 1023 (8th Cir. 2002) (quoting McKinney, 228 F.3d at 863), "[t]he need for medical evidence . . . does not require the [Commissioner] to produce additional evidence not already within

the record," **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (alterations added). The determination of whether an ALJ has failed in his or her duty to develop the record must be made on a case-by-case basis. **Gregg v. Barnhart**, 354 F.3d 710, 712 (8th Cir. 2003).

Other than sporadic treatment for various medical problems, including an earache in 1994 and a urinary tract infection and back pain in 1996, the majority of Plaintiff's treatment focused on the cause and alleviation of his abdominal pain. The ALJ's duty to develop the record does not result in an obligation to find evidence. The ALJ did not fail in his duty in the instant case; rather, the record does not support Plaintiff's claims of disabling back pain. "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001) (alteration added) (interim quotations omitted). Plaintiff has not made this necessary showing.

Plaintiff's Credibility. As noted above, Plaintiff is disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months and which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinic and laboratory diagnostic techniques." **Brown v. Shalala**, 15 F.3d 97, 98 (8th Cir. 1994). However, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." **Id.** (alteration added). Accord **Brown v. Chater**, 87 F.3d 963, 966 (8th Cir. 1996).

"'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis**, 392 F.3d at 996 (quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). "The ALJ need not explicitly discuss each Polaski factor." **Strongson v. Barnhart**, 361 F.3d 1066, 1072 (8th Cir. 2004). "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." **Id.** Accord **Lowe**, 226 F.3d at 972.

In the instant case, after thoroughly summarizing the medical evidence, the ALJ considered Plaintiff's subjective complaints and discounted them based on several Polaski factors, including the lack of supporting objective evidence, the lack of an opinion by Plaintiff's treating or examining physicians that he was disabled, the lack of any restrictions that would preclude all work activity, and inconsistencies in the record. These are proper considerations. See **Tellez v. Barnhart**, 403 F.3d 953, 9576 (8th Cir. 2005) (finding inconsistencies in information provided by claimant to physicians to be relevant in assessing her credibility); **Raney v. Barnhart**, 396 F.3d 1007, 1010 (8th Cir. 2005) (finding absence of any doctor's opinion that claimant was disabled detracted from claimant's credibility); **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physical restrictions placed on claimant by physician militated against finding of total disability); **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (subjective complaints of pain were properly discounted on grounds that, inter alia, they were inconsistent with absence of medically ordered commensurate restrictions on claimant's activities); **Shelton v. Chater**, 87 F.3d 992, 996 (8th Cir. 1996) (record supported statements concerning pain as a general matter but not to severity and degree of which claimant complained; recommendations of doctors were devoid

of any restrictions and were of conservative treatment; and limited activities were result of lifestyle choices, not medically necessitated limitations).

Additionally, as noted by the Commissioner, Plaintiff's abdominal pain was less or nonexistent when he stopped drinking, as recommended by one of his physicians. Evidence of effective control or treatment weighs against a claimant's credibility. **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005); **Fredricks v. Barnhart**, 359 F.3d 972, 976-77 (8th Cir. 2004); **Estes v. Barnhart**, 275 F.3d 722, 725 (8th Cir. 2002).

The Hypothetical Question to the VE. Plaintiff further challenges the ALJ's omission of certain test scores in his hypothetical question the VE.

"A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams**, 393 F.3d at 804 (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Vandenboom v. Barnhart**, 412 F.3d 924, 928 (8th Cir. 2005). The complained-of omission in the ALJ's hypothetical was included in a hypothetical question posed by Plaintiff's counsel. The omission was a requirement that Plaintiff lay down for at least one hour after an episode of abdominal pain. This requirement was not, however, accepted as true by the ALJ and is not, for the reasons set forth above, supported by the record.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  24th  day of August, 2005.